**Application of Francis William KIRSCH et al.**

**Patent Appeal No. 9062.**

United States Court of Customs and Patent Appeals.

June 27, 1974.

Barry A. Bisson, Wilmington, Del., attorney of record, for appellants.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

BALDWIN, Judge.

This is an appeal from the decision of the Patent Office Board of Appeals sustaining the rejection of claims 51–56, 58, 60–63, 65–69, 75, 77 and 86 of appellants' application.[1]

## The Invention

The invention relates to a paraffin-olefin alkylation process, described in appellants' amended Abstract of Disclosure as follows:

——Olefin-paraffin alkylate is prepared by contacting $C_3$–$C_9$ monoolefin with $C_4$–$C_6$ isoparaffin (which can, if desired, be prepared in situ from other paraffin isomers) in liquid phase with a substantially anhydrous acidic crystalline alumino-silicate zeolite, and stopping such contacting after substantial alkylation (which can include self-alkylation of the isoparaffin) has occurred but before the weight rate of production of unsaturated hydrocarbon becomes greater than the weight rate of production of saturated hydrocarbon. The degree of conversion of olefins and paraffins to saturate products can be increased by use of halide adjuvants containing bromine, chlorine or fluorine.——

Claims 51 and 77 are representative:

51. A paraffin-olefin alkylation process which comprises contacting at least one monoolefin of the $C_2$–$C_9$ range in admixture with paraffin of the $C_4$–$C_6$ range and in the presence of an alkylation-promoting amount of a halide containing chlorine, bromine

1. Serial No. 716,190, filed March 26, 1968, which includes certain additional claims that the board noted were "indicated to be allowable in substance."

or fluorine with a substantially anhydrous acidic crystalline alumino-silicate zeolite under alkylating conditions.

77. Process for the preparation of an olefin-paraffin alkylate comprising contacting isobutane with monoolefin selected from the group consisting of isobutylene, butene-2, and butene-1, and with a substantially anhydrous acidic crystalline alumino-silicate zeolite, at a temperature in the range of 25–120°C. and at a pressure such that each of the reactants is substantially in liquid phase,

(i) said contacting being effected utilizing sufficient agitation so that substantially all of said zeolite is maintained in suspension in the liquid reaction mixture,

(ii) the amount of unreacted olefin in the reaction mixture being maintained at less than 7 mole percent based on the unreacted isobutane, and

(iii) wherein the mean weight hourly space velocity of the hydrocarbons in the reaction mixture is in the range of 2–20 gram hydrocarbon per hour-gram catalyst; and wherein said contacting is in the presence of an alkylation-promoting amount of a halide containing chlorine, bromine or fluorine.

Claim 86, the only other independent claim on appeal, differs from claim 77 in being directed to contacting butene-1 in the presence of *n-butane* and in additionally reciting that the contacting of step (1) is "in the presence of an alkylation-promoting amount of a halide containing chlorine, bromine or fluorine." [2] The other appealed claims depend either directly or indirectly from claim 51. The brief for the Commissioner succinctly describes the additional recitations in those claims as follows:

Claim 52 recites a $C_3$–$C_9$ monoolefin and a $C_4$–$C_6$ isoparaffin, with reaction at a "temperature below the critical temperature of the lowest boiling hydrocarbon reactant and at a pressure such that the reactants are substantially in liquid phase." In claim 53, the monoolefin is butene-1, butene-2 or isobutylene and the isoparaffin is isobutane. The concentration of unreacted olefin in claim 54 "is kept sufficiently low that predominantly saturated paraffin-olefin alkylation products are obtained rather than unsaturated products." A range of hydrocarbon space velocity is added in claim 55 and unreacted olefin is kept at less than 12 mole percent based on paraffin content in claim 56. Added limitations regarding the alumino-silicate zeolite appear in claims 58, 60 to 63, and 67. Claim 65 provides for a continuous process. The alkylate has no more than 0.5% of unsaturated products in claim 66. The zeolite is in suspension in claim 68. The reactants and temperature range (25° to 120°C) are specified in claim 69 and one product of reaction is a paraffin hydrocarbon [obtained] by hydrogen transfer in claim 75.

*The References*

Garwood relates to the alkylation of branched chain hydrocarbons in the presence of an acidic crystalline alumino-silicate catalyst having active cites which provide selective activity for effecting alkylation with different alkylating agents. The reference emphasizes alkylation of branched chain paraffins including isobutane with the preferred alkylating agents being "ethylene, propylene, dodecylene and the like (those containing 2 to 12 carbon atoms being particularly suitable)." The zeolite catalyst may be exchanged with rare earth metal cations including those of cerium. It is stated that "[a]dvantageously," the temperature of the alkylation process may extend "from room temperature to 600°F.; preferably the process operat-

2. The board noted that item (ii) of claim 86 (reading the same as the corresponding item in claim 77) refers to "unreacted isobutane" whereas the body of the claim is directed to the reaction of n-butane, but that matter is not before us.

ing at 50° to 300°F." Garwood discusses "liquid phase operation" and states that it is particularly desirable for allowing certain catalysts "to exhibit greater selective activity for alkylation without promoting undesirable side reactions such as polymerization that may *occur during vapor phase operation.*" Liquid hourly space velocity of the isoparaffins may be "from about 0.1 to 10." While the reference refers to relative molar ratios between the isoparaffins and the alkylating agents on the order of about 3 to 1, it states that "higher molar ratios, *e. g.*, about 12 to 1 may be desirable for certain reactions."

Rabo discusses various type zeolite catalysts for use in a number of hydrocarbon conversion processes. Inclusion in the catalysts of polyvalent metal cations, including cerium cations, is described as preferred to enhance activity. Such processes as "isomerization, reforming, hydrocracking, alkylation and dealkylation" are given particular mention. Further, Rabo states:

It should be emphasized that the *present catalyst, unlike those of the prior art, does not employ the usual corrosive halide activators,* i. e., such as chlorine, fluorine, etc. to enhance its activity. Moreover, the present catalyst is water-resistant under the reaction conditions set forth above. This feature is a direct result of the avoidance of halide activators. If halide activators were present in the catalyst, by adding water, corrosive hydrogen chloride or hydrogen fluoride would be formed and would leave the catalyst. Water amounts up to 1000 parts per million in the hydrocarbon feed, however, are tolerable for short periods of time to the catalyst of the present invention. In the prior art, on the other hand, the water in the feed had to be below 20 parts per million. Hence, the feed in the prior art had to be thoroughly dried before use. This feature is completely avoided by the process of the present invention. *It should be emphasized, however, that under certain conditions activators*

*may be employed in the process of this invention.* However, even without the use of activators the equilibrium in the isomerization of the hexane and pentane fractions can be approached with facility. [Emphasis added.]

The patent also emphasizes the effectiveness of certain of its zeolite catalysts in conducting reactions at lower temperatures than heretofore "except in some instances wherein the prior art employed relatively large amounts of corrosive, acidic activators." However, it continues:

It should not be inferred from this that the new catalysts must not under any circumstances have added thereto or to the reactant feed some Lewis acid type halide containing activator. When desired for special effect, activators may be employed. The benefit achieved through the addition of an activator will vary with changes in feed compositions, temperature of reaction, moisture or other impurity in the feed, and the like. In some instances such as in hydrocracking, hydroisomerization and hydrodealkylation the activation may be employed to assist in reaching stable operating conditions more quickly and easily.

In a specific discussion of alkylation, Rabo states:

In this embodiment of the present invention, isoparaffins and aromatics can be alkylated. Typical of the feed stocks for such a conversion process are iso $C_4$–$C_6$ paraffins plus gaseous $C_2$–$C_6$ olefins or aromatic hydrocarbons such as benzene and substituted benzene such as phenol and chlorobenzene plus gaseous and liquid $C_2$–$C_{15}$ olefins.

Miale "is concerned with a method wherein an organic charge undergoes catalytic conversion in the presence of a volatile metal halide and a catalyst consisting essentially of specified crystalline aluminosilicates." It states that the activity of the catalyst is "unexpectedly enhanced or promoted upon contact with a volatile activating compound." The

reactions catalyzed include "hydrocarbon cracking, alkylation, dealkylation, disproportionation, isomerization and polymerization."

### The Rejection

All of the appealed claims except claim 86 stand rejected under 35 U.S.C. § 103 as obvious over Garwood et al. (Garwood)[3] in view of Rabo et al. (Rabo)[4] or Miale et al. (Miale).[5] Some of the claims, including claim 86, stand rejected as vague and indefinite under 35 U.S.C. § 112, second paragraph.

### OPINION

Turning first to the rejection based upon the prior art, appellants recognize that Garwood teaches the basic catalytic paraffin-olefin alkylation process involved here, including the "substantially anhydrous acidic crystalline aluminosilicate zeolite." They refer to the "one point of novelty in the Claim 51 process" as "the requirement that the contacting be *'in the presence of an alkylation-promoting amount of a halide containing chlorine, bromine or fluorine.'* " The board found that feature to be taught by both Rabo and Miale, and that to include it in the process of Garwood would be obvious to a person of ordinary skill in the art. We agree.

It is true that Rabo does not prefer to use halide activators with his aluminosilicate or zeolite catalyst because of the corrosive effect they apparently have. However, Rabo does recognize the benefits of the halides as activators and states they may be employed under certain conditions—as the board stated, "for their beneficial effects if the concomitant corrosion problem is accepted." The board further found that Miale is particularly directed to the activating effect of volatile metal halides and that it points out the superior results provided when crystalline aluminosilicates are so activated.

Appellants emphasize that Rabo and Miale refer to cracking and dealkylation as among the processes which are promoted by the metal halides. They argue that those two processes are diametrically opposed to alkylation and urge that the references, accordingly, teach away from appellants' alkylation process. No merit can be seen in the argument since it overlooks the fact that both references specifically refer to their inventions as being also directed to alkylation processes. The board took special note of appellants' argument, but rejected it stating:

> In general, the crystalline aluminosilicates are both alkylating and dealkylating catalysts (see Rabo et al. and Miale et al.), depending on feeds and reaction conditions, and an improvement in the latter activity would not necessarily contraindicate an improvement in the former activity.

Referring specifically to Miale, the board further commented:

> the fact that activation with volatile metal halides improves cracking and dealkylation activity does not lead away from alkylation processes, because the crystalline aluminosilicates are both alkylation and dealkylation catalysts, depending on feeds and reaction conditions. The Miale et al. specific reference to alkylation of aromatics . . . is not inconsistent with the general reference to alkylation [in it] . . . or with the general improvement in catalytic activity discussed in [it] . . . .

We do not find appellants to have made any persuasive rebuttal of the board's reasoning. Thus we do not think that a person skilled in the art would regard the reference to other hydrocarbon conversions to negate the specific teaching of alkylation by the references.

Appellants further argue that proper weight has not been given "to the show-

3. Patent No. 3,251,902, issued May 17, 1966.

4. Patent No. 3,236,762, issued February 22, 1966.

5. Patent No. 3,354,078, issued November 21, 1967.

ings, in the specification and the affida-vit of Dr. Kirsch, of "[the] *unexpected, beneficial result*, provided by appellants' invention" (emphasis in original). The board stated that it carefully studied the Kirsch affidavit, but concluded that it "merely confirms the unexpected improvement in catalytic activity which is emphasized particularly by Miale et al." It apparently referred particularly to the statement in Miale that the catalyst was "unexpectedly" enhanced by the contact with "a volatile activating compound." We too have carefully examined the Kirsch affidavit but do not see that it demonstrates any improvement in appellants' claimed process that would not be expected in view of the disclosure in both of the secondary references that the addition of volatile metal halides enhances the activity of zeolite catalyzed reactions. So far as the record appears, appellants may have simply made the choice, offered by Rabo, of tolerating the corrosive effect of the "usual corrosive halide activators" to attain the enhanced activity they provide.

A limitation of certain of the dependent claims and of claim 77, specifically argued by appellants, requires that the process be carried out in liquid phase. However, we, like the board, are convinced that both Garwood and Rabo do include definite disclosures of what is clearly liquid phase operation as described and claimed by appellants.

The examiner having discussed at length the specific recitations added to the various other claims, the board found it unnecessary to do so. Rather it made the holding, in which we find no reversible error, that:

> Certain of the claims include additional features, such as specific reactants, mixing, low olefin concentration, space velocity, specific aluminosilicates, continuous operation, and temperature. Comparison of these features with the cited art indicates that they are either not novel or not

unobvious departures from the teachings of the references. At the best, such variations as may be expressed are well within the expected skill of the technician of ordinary ability in this art.

Two features mentioned in the above holding, "low oelfin concentration" and "space velocity," appear in claim 77 as well as in some of the dependent claims. The examiner, as the solicitor noted, considered the disclosure in Garwood pertaining to the paraffin to olefin mole ratio—"higher molar ratios, *e. g.,* about 12 to 1"—to be suggestive of a ratio of 14 to 1, which amounts to about 7 mole percent. We consider that teaching adequate to negate unobviousness here, particularly since the recited percentage is not disclosed as or proved to be critical vis-à-vis the reference ratio. As to the recitation that the space velocity in the reaction mixture is in the range of 2–20 gram hydrocarbons per hour-gram catalyst, the examiner referred in his answer to Garwood's disclosure of space velocities "as high as 10," obviously depending on the disclosure of "about .1 to 10" quoted in our description of that reference. Despite considerable argument in their briefs about space velocity, appellants do not deny that this disclosure of Garwood falls within their recited range.

Accordingly, the board's treatment of the rejection of claims 51–56, 58, 60–63, 65–69, 75 and 77 under 35 U.S.C. § 103 is free of reversible error and will be sustained.

Therefore, the rejection of claim 86 alone under 35 U.S.C. § 112 requires our consideration although the rejection also applied to some of the other appealed claims. The basis of that rejection is that the recitation therein (reading like item (ii) of claim 77), requiring the amount of unreacted olefin in the reaction mixture be maintained at less than 7 mole percent based on the unreacted isobutane, is vague and indefinite.[6] The

---

6. Since we reverse this rejection on the merits we see no occasion to consider appel-

lants' argument that the board improperly considered the examiner to have included

rejection is based on the view that the language of the recitation sets only a maximum amount of olefin and hence "is inclusive of substantially no olefin, resulting in the termination of any reaction." We see no merit in this rejection. The claim requires a process for the preparation of olefin-paraffin alkylate by contacting the two reactants under defined conditions. The imposition of a maximum limit on the quantity of one of the reactants without specifying a minimum does not warrant distorting the overall meaning of the claim, to preclude performing the claimed process. The rejection of claim 86 will not be sustained.

The decision is affirmed as to claims 51–56, 58, 60–63, 65–69, 75 and 77 and reversed as to claim 86.

Modified.

this and certain other claims with still other claims, which the examiner specifically rejected on the same grounds. Also, we have given no consideration to the matter discussed in note 2, *supra.*